**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

JADENE STENSLAND,                    )
                                     )
                Plaintiff,           )   No. 03:11-cv-00490-HU
                                     )
vs.                                  )
                                     )
CITY OF WILSONVILLE, a municipality )**MEMORANDUM OPINION AND ORDER**
incorporated in the State of Oregon;) **ON MOTION FOR PARTIAL**
MICHAEL BOWERS, an individual; and  )    **SUMMARY JUDGMENT**
MICHAEL STONE, an individual;        )  **AND MOTION TO DISMISS**
                                     )
                Defendants.          )

_____

Abraham J. Barnett
The Barnett Firm, LLC
10200 S.W. Greenburg Road, Suite 340
Portland, OR 97223

          Attorney for Plaintiff

John Kreutzer
Brian K. Weeks
Smith Freed & Eberhard P.C.
111 S.W. Fifth Avenue, Suite 4300
Portland, OR 97204

          Attorneys for Defendants

1 - MEMORANDUM OPINION AND ORDER

1    HUBEL, Magistrate Judge:

2

3                        ***INTRODUCTION***

4         The plaintiff Jadene Stensland brings this employment action

5    against her former employer, City of Wilsonville (the "City"); her

6    former direct supervisor, Michael Stone; and Stone's direct

7    supervisor, Michael Bowers.  The case is before the court on the

8    defendants' motion seeking partial summary judgment as to certain

9    of Stensland's claims, and dismissal of certain of her claims.

10   Dkt. #10.

11

12                       ***BACKGROUND FACTS***

13        On March 14, 2006, the City extended an offer of employment to

14   Stensland by way of a letter.  Among other things, the letter

15   specified that "[t]he Deputy City Engineer - Capital Projects

16   position[] is an at will position which serves at the pleasure of

17   the City Manager.  All city management employees have signed a

18   statement that they understand this status."  Dkt. #13, Decl. of

19   Andrea M. Villagrana (the City's Human Resources Manager), Ex. 1,

20   p.1.  On March 17, 2006, Stensland accepted the employment offer by

21   signing the bottom of the letter evidencing her agreement with the

22   terms and conditions of employment outlined in the letter.  *Id.*,

23   p. 2.

24        Enclosed with the letter offer was the City's "Manager Staff

25   Directive #41," which stated as follows:

26             Management/Confidential At-Will Status

27             The City Manager has the final authority in
              the appointment, removal, and supervision of
28             all management/confidential employees, with

2 - MEMORANDUM OPINION AND ORDER

1

2

    the exception of those appointed directly by the City Council (City Attorney, Judge).

3

4

    Management/Confidential employees are employed at-will and the City and its employees mutually reserve the right to end the employment relationship, with or without cause, at any time.

5

6

7

8

    . . . In lieu of individual contracts, management/confidential employees shall sign this staff directive indicating receipt and understanding of the terms of employment with the City of Wilsonville.

9 *Id.*, Ex. 2; Dkt. #20-2, Amended Decl. of Plaintiff, Directive #41

10 (ECF p. 34 of 46). Stensland signed a legend at the bottom of

11 Directive #41, indicating, "I, Jadene Stensland[,] have received

12 and read a copy of this City Manager Directive regarding my at-will

13 status as an employee of the City of Wilsonville." *Id.*

14     The City does not have an employee handbook, but does have a

15 set of City Manager Staff Directives (collectively, the "Staff

16 Directives") setting forth key policies and procedures of the City.

17 Dkt. #14, Decl. of Michael Kohlhoff (City Attorney), ¶ 3; Dkt. #20,

18 ¶ 22 & Ex. C. A copy of the Staff Directives was provided to

19 Stensland during the course of her employment with the City. Dkt.

20 #20, ¶ 22. The Staff Directives include, among other things,

21 Directive #41, quoted above; Directive #11, describing the City's

22 Administrative Leave policy; Directive #18, explaining the timing

23 of performance evaluations, and their distribution by the Human

24 Resources Assistant; and Directive #27, the City's anti-harassment

25 and anti-discrimination policies and procedures. *See* Dkt. ##20-1

26 & 20-2.

27     Stensland began working for the City on April 24, 2006. She

28 alleges that beginning at some point in 2008, and continuing until

3 - MEMORANDUM OPINION AND ORDER

her termination in the spring of 2010, she was subjected to ongoing gender-based discrimination and sexual harassment by Gerald Fisher, an employee under her direct supervision, and whom she claims is "a close personal friend" of Stone's.  Dkt. #1, ¶ 9.  Specifically, she alleges the following:

a)   Fisher "engage[d] in insubordinate behavior directed at [Stensland's] gender" including, without limitation, "openly expressing his unwillingness to be supervised by a woman."  Dkt. #1, ¶ 9; Dkt. #20, ¶ 11.

b)   In September 2008, Stensland completed an annual review of Fisher "which included comments relating to needed improvement of his communication and social skills." Dkt. #20, ¶ 6.  Stone directed her to revise the report to indicate Fisher was exceeding expectations in all categories.  *Id.*

c)   Stensland "received in her departmental inbox a 1950's magazine article, which stated boldly, 'Women should know their place[.]'" *Id.*, ¶ 12; *see* Dkt. #20, Ex. B (article entitled "The good wife's guide," stating, *inter alia*, "A good wife always knows her place.").  Stensland believed the article "was a matter of harassment and discrimina-tion based on [her] status as a woman[.]"  Dkt. #20, ¶ 13.  Stone failed to address her complaint regarding the article.  *Id.*

d)   Stone told Stensland and the company's Human Resources Manager that Fisher did not want to work for a woman, and it would be better if Fisher reported directly to Stone. Dkt. #1, ¶ 15; Dkt. #20, ¶¶ 10 & 11.

4 - MEMORANDUM OPINION AND ORDER

e)   Stensland recommended, in the summer of 2009, that Fisher be terminated "based on his continued insubordinate and inappropriate behavior, which was primarily directed at [Stensland's] gender."  Stone verbally reprimanded her for this recommendation, explaining that managers could only be terminated in accordance with certain disciplinary procedures set forth in the City's "Staff Directives" manual.  Stone allowed Stensland to give Fisher a verbal warning.  Dkt. #1, ¶¶ 16-17.

f)   Stensland conducted a standard performance evaluation of Fisher on or about September 4, 2009, which included a recitation of Fisher's insubordinate behavior.  On or about September 11, 2009, Stone ordered Stensland to amend the evaluation "to remove all references to any insubordinate behavior."  *Id.*, ¶¶ 18-19.  Stensland was threatened with termination if she refused to make the changes.  Dkt. #20, ¶ 14.

g)   Stensland was "reassured" by Stone that "discipline for Managers follows the union process," and she would not be terminated until she had "received a verbal warning, followed by a written warning and provided with a work-plan to help [her] succeed."  *Id.*, ¶ 15.

h)   In the fall of 2009, Fisher told his co-workers that he and Stone "had conceived a plan to push [Stensland] 'out of the picture[.]'"  Fisher "showed co-workers a new organizational chart which included Fisher in [Stensland's] position, and did not include [Stensland]

at all." Stensland reported the matter to Stone, but no action was taken. Dkt. #1, ¶¶ 20-22.

i) Following Fisher's comments to his co-workers, a rumor began circulating about Stensland being forced out, and sometime thereafter, her "project assignments decreased from an average of six active assignments to one." *Id.*, ¶ 24. In February 2010, her supervisory authority over Fisher was revoked, and her duties were decreased, "accommodating Fisher's unwillingness to work for a woman by having Fisher report directly to Stone." *Id.*, ¶ 26.

j) Stensland also reported the ongoing hostile work environment to Bowers during the winter of 2009-2010 and spring of 2010. To her knowledge, no investigation ever took place in response to her complaints. *Id.*, ¶¶ 27-28.

Stensland alleges that prior to her complaints about Fisher's discriminatory and harassing behavior, and the resulting hostile work environment, her performance evaluations always were satisfactory in all respects. She claims that in April 2010, Bowers approached her to discuss her work assignments, and during their meeting, Bowers "assured" her that a management-level employee could not be fired for performance-related issues "without first being counseled and given the opportunity to improve in those areas." *Id.*, ¶¶ 31-32. However, despite her "requests for assistance from the management team over the course of eighteen months," Stensland never was offered any coaching or mentoring. Dkt. #20, ¶ 21. She was terminated on May 21, 2010. According to Stensland, her termination was "based on alleged performance related issues." *Id.*, ¶ 33.

6 - MEMORANDUM OPINION AND ORDER

1    Stensland filed the instant case on April 21, 2011, asserting

2 claims under 42 U.S.C. § 1983 and ORS § 659A.030, for sexual

3 harassment, hostile work environment, wrongful discharge,

4 retaliation, breach of contract, and violation of her constitu-

5 tional rights. Stensland claims the defendants' actions caused her

6 to suffer "pain, fear, grief, anxiety, worry, and embarrassment,"

7 *id.*, ¶ 42, and she seeks economic, noneconomic, and punitive

8 damages, *id.*, p. 18. She has alleged ten causes of action:

9    • First Claim for Relief: Fourteenth Amendment
       Violation; 42 USC § 1983 (Against Stone, and
10     Bowers, and City of Wilsonville) [gender-based
       discrimination, sexual harassment, hostile work
11     environment, and retaliatory discharge]
     • Second Claim for Relief: Fourteenth Amendment
12     Violation; 42 USC § 1983 (Against City of
       Wilsonville) [equal protection violation as a
13     result of City's alleged endorsement and approval
       of Stone's, Bowers's, and Fisher's actions]
14   • Third Claim for Relief: Constitutional Rights
       Violations by City of Wilsonville Due to Failure to
15     Adequately Train and Supervise
     • Fourth Claim for Relief: Negligent Retention and
16     Supervision (Against City of Wilsonville)
     • Fifth Claim for Relief: Sexual Harassment (Against
17     City of Wilsonville). Count One: Discrimination.
       Count Two: Hostile Work Environment. Count Three:
18     Retaliation.
     • Sixth Claim for Relief: Wrongful Discharge (Against
19     City of Wilsonville)
     • Seventh Claim for Relief: Breach of Employment
20     Contract (Against City of Wilsonville)
     • Eighth Claim for Relief: Breach of Implied Contract
21     (Against City of Wilsonville)
     • Ninth Claim for Relief: Breach of Oral Contract
22     (Against City of Wilsonville)
     • Tenth Claim for Relief: Breach of Duty of Good
23     Faith and Fair Dealing (Against City of Wilson-
       ville)
24 Dkt. #1.

25    On October 30, 2009, Stensland filed a petition for relief

26 under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.*

27 *See* Dkt. #12, Decl. of Brian K. Weeks, Ex. 1 (copy of Stensland's

28 Voluntary Petition in Bankruptcy Case No. 09-39088-elp7). She

7 - MEMORANDUM OPINION AND ORDER

filed her bankruptcy schedules on November 19, 2009. *Id.*, Ex. 2. Stensland did not list as an asset in her bankruptcy schedules any claims, including any potential or contingent claims. *Id.* Stensland received a "No Asset" discharge on February 16, 2010. *Id.*, Ex. 3 (docket sheet in Case No. 09-39088-elp7 (Bankr. D. Or.); *see* Dkt. #21, noting entry of order of discharge). She has not moved to amend her bankruptcy schedules at any time since her discharge. *See id.*

The defendants move for partial summary judgment or dismissal as to all of Stensland's claims for relief, except her sexual harassment claim against the City for alleged actions that occurred after February 16, 2010. The court will review the standards for summary judgment and for motions to dismiss, and then consider each of the defendants' motions.

### *SUMMARY JUDGMENT STANDARDS*

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, the court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002) (citing *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996)).

The Ninth Circuit Court of Appeals has described "the shifting burden of proof governing motions for summary judgment" as follows:

8 - MEMORANDUM OPINION AND ORDER

The moving party initially bears the burden of proving the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. 2548. Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial. *Id.* at 324, 106 S. Ct. 2548. This burden is not a light one. The non-moving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must do more than show there is some "metaphysical doubt" as to the material facts at issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 528 (1986). In fact, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor. *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505. In determining whether a jury could reasonably render a verdict in the non-moving party's favor, all justifiable inferences are to be drawn in its favor. *Id.* at 255, 106 S. Ct. 2505.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010). Notably, "[a]s a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1124 (9th Cir. 2000). The *Chuang* court explained that this minimal evidence standard is due to the nature of employment cases, where "'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'" *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

9 - MEMORANDUM OPINION AND ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### STANDARDS FOR MOTIONS TO DISMISS

Chief Judge Aiken of this court recently set forth the standard for the court's consideration of a motion to dismiss in *Gambee v. Cornelius*, No. 10-CV-6265-AA, 2011 WL 1311782 (D. Or. Apr. 1, 2011) (Aiken, C.J.).  Judge Aiken observed:

> Under Fed. R. Civ. P. 12(b)(6), a complaint is construed in favor of the plaintiff, and its factual allegations are taken as true. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563[, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929] (2007).  "[G]enerally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint." *Daniels-Hall*, 629 F.3d at 998.

*Id.* at *2.

### DISCUSSION

**A.   Judicial Estoppel**

The defendants seek summary judgment on all of Stensland's claims that arose on or before February 16, 2010 - the date of her bankruptcy discharge - on the basis that those claims are precluded under the doctrine of judicial estoppel because Stensland failed to list those claims on her bankruptcy schedules, and she also failed

10 - MEMORANDUM OPINION AND ORDER

to move to amend her bankruptcy schedules after her employment with the City was terminated. The defendants argue Stensland "obviously knew of the alleged facts relating to her claims" prior to filing her bankruptcy schedules "because she alleges that she complained about discrimination and harassment prior to and throughout 2009." Dkt. #11, p. 8.

Stensland argues she was not aware of any cause of action against the defendants prior to her bankruptcy discharge. She asserts "[h]er claim did not become actionable until she was subjected to the adverse employment action of being fired." Dkt. #15, p. 4. She notes she was not fired until three months after her bankruptcy discharge, and she did not give notice to the City of her tort claim until September 9, 2010. *Id.*, p. 5.

It has been observed that, "[i]n the context of failure to disclose a claim in bankruptcy, the law of judicial estoppel is well-established in this circuit." *Simoneau v. Nike, Inc.*, No. 04-CV-1733-BR, 2006 WL 977302, at *3 (D. Or. Apr. 6, 2006) (Brown, J.). The Ninth Circuit Court of Appeals discussed the judicial estoppel doctrine in *Hamilton v. State Farm Fire & Casualty Co.*, 270 F.3d 778 (9th Cir. 2001), a case on which the defendants rely. The *Hamilton* court explained:

> Judicial estoppel is an equitable doc-trine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position. *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600-601 (9th Cir. 1996); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). This court invokes judicial estoppel not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of "general consideration[s] of the orderly administration of justice and to 'protect

11 - MEMORANDUM OPINION AND ORDER

1          against a litigant playing fast and loose with
2          the courts.'  *Russell*, 893 F.3d at 1037.

3  *Hamilton*, 270 F.3d at 782.

4          The *Hamilton* court observed that the United States Supreme
5  Court has "listed three factors that courts *may* consider in
6  determining whether to apply the doctrine of judicial estoppel[.]"
7  *Id.* (emphasis in original).  The three factors were enumerated by
8  the Court in *New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121
9  S. Ct. 1808, 1815, 149 L. Ed. 2d 968 (2001).  The *Hamilton* court
10  summarized the three factors as follows: (1) whether the party's
11  later position is "'clearly inconsistent' with its earlier
12  position"; *Hamilton*, 270 F.3d at 782 (citations omitted); (2)
13  whether a court accepted the party's earlier position, "so that
14  judicial acceptance of an inconsistent position in a later
15  proceeding would create 'the perception that either the first or
16  the second court was misled'"; *id.* (quoting *Edwards v. Aetna Life
17  Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)); and (3) "whether the
18  party seeking to assert an inconsistent position would derive an
19  unfair advantage or impose an unfair detriment on the opposing
20  party if not estopped"; *Hamilton*, 270 F.3d at 783 (citations
21  omitted).  The *New Hampshire* Court noted these three factors are
22  not exclusive or inflexible, nor is the formula exhaustive.
23  Rather, the equities must be balanced in each specific factual
24  context.  *Id.* (paraphrasing *New Hampshire*, 532 U.S. at 751, 121
25  S. Ct. at 1815).

26          The *Hamilton* court explained that judicial estoppel acts to
27  prevent litigants from taking inconsistent positions within a
28  single action, and also "from making incompatible statements in two

12 - MEMORANDUM OPINION AND ORDER

different cases." *Id.* (citing *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir. 1996)).  "In the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements." *Id.* (citing *Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992); additional citations from other Circuits omitted). Notably, however, because "[j]udicial estoppel seeks to prevent the *deliberate* manipulation of the courts[,] it is inappropriate . . . when a party's prior position was based on inadvertence or mistake." *Helfand v. Gerson*, 105 F.3d 530, 536 (9th Cir. 1997) (citations omitted; emphasis added).

Application of the three *New Hampshire* factors to the facts of this case supports the defendants' position.  First, Stensland's "later position" -- that is, her claims asserted against the defendants in this action – clearly is inconsistent with her prior position in her bankruptcy case, where she represented that she had no claims, contingent or otherwise, against the defendants, or against anyone else for that matter.  Even contingent, disputed, and unmatured claims fall within the scope of the claims that must be disclosed in bankruptcy.  *Simoneau*, 2006 WL 977302, at *3 (citing 11 U.S.C. § 101(5), which defines the term "claim" to mean, *inter alia*, a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured"); *see Hay*, 978 F.2d at 557 (despite the fact that not *all* facts were known to the debtor, "enough was known to

13 - MEMORANDUM OPINION AND ORDER

1  require notification of the existence of the asset to the
2  bankruptcy court") (citations omitted).

3      Second, Stensland succeeded in persuading the bankruptcy court
4  to accept her earlier position, which resulted in a no-asset
5  discharge.  Judicial acceptance of her inconsistent position in
6  this proceeding would create the misconception that either the
7  bankruptcy court or this court was misled.  *See Hamilton*, 270 F.3d
8  at 782 (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599
9  (6th Cir. 1982)).

10     Third, Stensland would derive an unfair advantage over her
11 creditors if she were allowed to maintain her inconsistent
12 position, undermining the integrity of the very judicial system the
13 doctrine of judicial estoppel seeks to protect.  *See Oneida Motor
14 Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.
15 1988).  I note Stensland and her husband had over $2 million in
16 debt, $1.5 million of which was unsecured.  Creditors rely on the
17 assets listed in a debtor's bankruptcy schedules in determining
18 whether or not to contest discharge.  *See Whitworth v. Nat'l Enter.
19 Sys., Inc.*, No. 08-968-PK, 2009 WL 2948529, at *4 (D. Or. Sept. 9,
20 2009) (King, J.) (citing *Hamilton*, 270 F.3d at 785).  "The
21 possibility that the debtor has a meritorious employment
22 discrimination claim might cause a creditor to think twice before
23 conceding to the discharge of debts."  *Harvey v. Southern Minn.
24 Beet Sugar Coop.*, No. 02-4934, 2004 WL 368471, at *2 (D. Minn. Feb.
25 26, 2004) (citing *United States ex rel. Gebert v. Transp. Admin.
26 Servs.*, 260 F.3d 909, 913 (8th Cir. 2001) ("property of the
27 bankruptcy estate includes all causes of action that the debtor
28

14 - MEMORANDUM OPINION AND ORDER

1    *could have brought* at the time of the bankruptcy petition";
2    emphasis by the *Harvey* court).

3         This analysis assumes Stensland's claims against the
4    defendants accrued prior to her discharge in bankruptcy. Stensland
5    argues otherwise, and further asserts, without citation to any
6    supporting authority, that the question of her "knowledge of a
7    potential claim is [a] factual determination that must be decided
8    by the finder of fact." Dkt. #15, p. 5. The issue of when a cause
9    of action "accrues" for purposes of a § 1983 action is governed by
10   federal law. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 379
11   (9th Cir. 1998). "Under federal law, the claim generally accrues
12   when the plaintiff 'knows or has reason to know of the injury which
13   is the basis of the action.'" *Id.* (quoting *Elliott v. City of
14   Union City*, 25 F.3d 800, 801-02 (9th Cir. 1994)). "Courts impose
15   judicial estoppel when the debtor 'has knowledge of enough facts to
16   know that a potential cause of action exists during the pendency of
17   the bankruptcy, but fails to amend [her] schedules or disclosure
18   statements to identify the cause of action as a contingent asset.'"
19   *Franklin v. Nike, Inc.*, No. CV-07-1667-PK, 2009 WL 6048126, at *6
20   (D. Or. Nov. 13, 2009) (Papak, M.J.); *cf. Stupek v. Wyle Labs.
21   Corp.*, 327 Or. 433, 438, 963 P.2d 678, 681 (1998) (cause of action
22   under Oregon law accrues when facts have occurred and are in
23   existence that would be necessary for the plaintiff to prove in
24   order to support a right to judgment).

25        To determine whether Stensland knew or had reason to know,
26   prior to her bankruptcy discharge, that she had a potential claim
27   for gender-based discrimination or sexual harassment, the court
28   must examine the elements of those claims and determine when the

15 - MEMORANDUM OPINION AND ORDER

events occurred that would have given rise to a potential claim. Stensland couches her § 1983 claims in terms of Fourteenth Amendment violations, rather than strictly as violations of Title VII. *Cf. Stewart v. Jackson County*, slip op., No. CV-09-3039-CL, 2010 WL 4955874, at *3 (D. Or. Nov. 29. 2010) (Clarke, M.J.) (observing that "a plaintiff must exhaust administrative remedies by filing a claim with the EEOC or BOLI before bringing a title VII action[, but] [s]ections 1981 and 1983 do not require such exhaustion") (citing 42 U.S.C. § 2000e-5(f); *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008)).

In her First Claim for Relief, Stensland claims the defendants violated her right to equal protection of laws prohibiting discrimination and harassment on the basis of a person's sex, and prohibiting a hostile work environment. "Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (quoting 42 U.S.C. § 2000e-2(a)(1)). Thus, although pled under section 1983, the genesis of Stensland's claim is in Title VII.

The Ninth Circuit has explained the elements of a Title VII sexual harassment and hostile work environment claim as follows:

> "To state a claim under Title VII, sexual harassment 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ellison v. Brady*, 924 F.2d 872, 876 (9th Cir. 1991) (citation omitted). To prevail under a hostile environ-

ment claim, a plaintiff must show that the environment was both objectively and subjectively hostile, that is, that (1) a reasonable person would find the environment hostile or abusive and (2) the victim subjectively perceived her environment to be abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22, 114 S. Ct. 367, [370-71,] 126 L. Ed. 2d 295 (1993). . . .

*Best v. California Dept. of Corrections*, 21 Fed. Appx. 553, 556 (9th Cir. 2001) (citation omitted).

The *Best* court also discussed how the determination is made as to whether a work environment is sufficiently hostile or abusive for purposes of a Title VII claim:

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23[, 114 S. Ct. at 371]. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not amount to discriminatory changes in the terms and conditions of employment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, [2283,] 141 L. Ed. 2d 662 (1998); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). *Faragher* emphasized that "conduct must be extreme to amount to a change in the terms and conditions of employment." 524 U.S. at 788. Furthermore, it is clear that though harassing conduct or language need not be sexual in nature in order to state a hostile work environment claim under title VII, the harassment must be based on the victim's gender. *See Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir. 2000); *cf. Ellison*, 924 F.2d at 875 n.4.

Id.; *see Patrick v. Martin*, 402 Fed. Appx. 284, 285 (9th Cir. 2010) (verbal harassment, standing alone, is insufficient to state a claim under § 1983) (citing *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987)).

17 - MEMORANDUM OPINION AND ORDER

1    Stensland knew or had reason to know that she was being
2    harassed and subjected to discriminatory treatment on the basis of
3    her gender at the time each incident allegedly occurred.  She has
4    alleged that the ongoing, pervasive harassment affected her work
5    environment and the performance of her job, and her complaints
6    about the ongoing harassment led to a reduction in her work
7    assignments and ultimately to her termination.  She therefore knew
8    "of the injury which is the basis of the action." *Cabrera, supra*.
9    She had knowledge of enough facts to know that a potential cause of
10   action existed for sexual harassment and gender-based discrimi-
11   nation long before her employment was terminated, and certainly
12   while her bankruptcy case was pending.  Her claims for gender-based
13   discrimination, sexual harassment, and hostile work environment
14   accrued at the time she allegedly was harassed and subjected to
15   discriminatory treatment.  Those claims existed whether or not her
16   employment ultimately was terminated.

17        The court recognizes that there could be a case (and perhaps
18   this is one) in which discriminatory or harassing conduct occurs
19   over a period of time.  For awhile, the conduct may not amount to
20   a severe or pervasive enough environment to be actionable, but
21   enough egregious conduct may, at some point, accrue for it to be
22   actionable.  For Stensland, the question becomes, "When did the
23   alleged conduct go over the tipping point?"  A question of fact may
24   exist as to whether the tipping point was reached only after her
25   employment was terminated, and before that time, while the conduct
26   was offensive, it was not actionable.  If the facts are not clear
27   as to when it became actionable, then the question becomes, "When
28   did it become 'potentially actionable' enough to require Stensland

18 - MEMORANDUM OPINION AND ORDER

to list it on her bankruptcy schedules?" Despite the intellectual
attraction of this hair-splitting, the court finds the purpose of
the Bankruptcy Act is best served by requiring a debtor to err on
the side of claim disclosure, which Stensland did not do in this
case.

The court finds Stensland is judicially estopped from
asserting any claims made in reliance on adverse employment actions
and discriminatory behavior that preceded her bankruptcy discharge.
Her position in the bankruptcy proceeding that she did not have any
potential claims was inconsistent with her current position that
Fisher, Stone, and Bowers subjected her to discriminatory treatment
and created a hostile work environment prior to February 16, 2010.
She may, however, continue to pursue claims that relate to
discriminatory treatment and adverse employment actions occurring
after February 16, 2010. For example, she could not have known,
during the pendency of her bankruptcy case and prior to her
bankruptcy discharge, that she would be terminated by the City on
May 21, 2010. *Cf. Franklin*, 2009 WL 6048126, at *7. In addition,
as Stensland maintains in her brief, events that occurred prior to
February 16, 2010, can be considered as evidence relating to her
retaliatory discharge claim.

However, the court finds that entry of summary judgment on
Stensland's pre-February 16, 2010, claims would be premature at
this juncture. In order to ensure the integrity of the bankruptcy
system and the judicial system as a whole, and to ensure the just
resolution of the parties' claims on their merits, Stensland is
granted thirty days, to **January 16, 2012,** to substitute the
bankruptcy trustee as the real party in interest with regard to her

19 - MEMORANDUM OPINION AND ORDER

1   pre-February 16, 2010, claims, or alternatively, to have the
2   bankruptcy trustee ratify those claims by formally abandoning the
3   pre-February 16, 2010, claims as assets of the bankruptcy estate.
4   *See Schneider v. Unum Life Ins. Co.*, No. CV05-1402-PK, 2008 WL
5   1995459, at *4 (D. Or. May 6, 2008) (Redden, J.) (ordering
6   plaintiff to take similar actions).  Should Stensland fail to take
7   either of these actions by **January 16, 2012,** then the court will
8   enter summary judgment against her on those pre-February 16, 2010,
9   claims.

10      The court, therefore, **reserves** ruling on the defendants'
11  motion for summary judgment as to Stensland's pre-February 16,
12  2010, claims until after **January 16, 2012.**

13

14  ***B.    Breach of Employment Contract***

15      The defendants argue Stensland was at all times an at-will
16  employee, precluding her Seventh, Eighth, Ninth, and Tenth Claims
17  for Relief, all of which seek damages for the City's alleged breach
18  of an employment contract between Stensland and the city.  The
19  defendants seek summary judgment on those claims.

20      "[E]mployment contracts in Oregon are presumed to be at-will."
21  *Arboireau v. Adidas-Salomon AG*, 347 F.3d 1158, 1162 (9th Cir. 2003)
22  (citing *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or. App. 371, 879
23  P.2d 1288, 1293 (1994)).  "'Under Oregon law, there is a legal
24  presumption that absent a contractual, statutory or constitutional
25  requirement, an employer may discharge an employee at any time and
26  for any reason.'"  *Bland v. Blount, Inc.*, No. CV 00-579-BR, 2001 WL
27  814954, at *2 (D. Or. Apr. 9, 2001) (Brown, J.) (quoting *Koepping*
28  *v. Tri-County Metro. Transp. Dist.*, 120 F.3d 998, 1002 (9th Cir.

20 - MEMORANDUM OPINION AND ORDER

1   1997)); *accord Rushing v. SAIF Corp.*, 223 Or. App. 665, 669, 196

2   P.3d 115, 117 (2008) (at-will employee can be terminated "for any

3   reason, or for no reason at all, and at any time") (citing *State v.*

4   *Saxon, Marquoit, Bertonit & Todd*, 166 Or. App. 1, 6, 999 P.2d 1152,

5   1154 (2000)); *Patton v. J.C. Penney Co.*, 719 P.2d 854, 856 (Or.

6   1986), *abrogated on other grounds by McGanty v. Staudenraus*, 901

7   P.2d 841 (1995).  Even the employer's motives are irrelevant;

8   indeed, an at-will employment relationship may be terminated "even

9   for a bad cause." *Lund v. Arbonne Intern., Inc.*, 132 Or. App. 87,

10  92, 887 P.2d 817, 821 (1994) (citations omitted).

11      Stensland argues, however, that the City's employment

12  policies, as expressed in both verbal statements and written

13  documents, are contractually enforceable, even in an at-will

14  employment context.  Stensland argues the court first must

15  determine whether the terms contained in the City's employee manual

16  are ambiguous. Dkt. #15, p. 7.  However, she has failed to point

17  to any language in the Staff Directives, or any other document

18  distributed by the City, that states any policy the court must

19  interpret.  The only evidence presented here is, on the one hand,

20  Directive #41, expressly stating Management employees are employed

21  by the City at-will, which Stensland acknowledges having received;

22  and, on the other hand, alleged "assurances" by Stone and Bowers

23  that a management-level employee would not be terminated for

24  performance-related issues without first receiving counseling, and

25  an opportunity to improve in the areas of concern.

26      In Stensland's Complaint, she alleges the City's "written

27  employment policies" set forth the "promise" that she would not be

28  discharged "for substandard performance without first calling the

21 - MEMORANDUM OPINION AND ORDER

1  substandard performance to [her] attention"; and if her performance
2  ever was found to be substandard, "she would be subjected to
3  progressive discipline, including verbal warnings for the first
4  instance of poor performance and written warnings for the second
5  instance of the same substandard performance prior to termination."
6  Dkt. #1, ¶ 84(a) & (b).  The only "written employment policies"
7  Stensland has submitted to the court are the Staff Directives, none
8  of which discusses, or even mentions, progressive disciplinary
9  policies the City will follow prior to terminating an employee.
10 Stensland has alluded to provisions in a collective bargaining
11 agreement governing the City's union employees, but she has offered
12 no evidence to prove she was covered by any such document, nor has
13 she offered the document itself for the court's review.

14     The court finds Stensland has failed to meet her burden to
15 come forward with *some* evidence from which a jury could find a
16 written employment contract existed that rendered Stensland
17 anything other than an at-will employee.  Therefore, the
18 defendants' motion for summary judgment as to Stensland's Seventh
19 Claim for Relief: Breach of Employment Contract (Against City of
20 Wilsonville) is **granted.**

21     Stensland also alleges that an implied contract was created by
22 virtue of the City's maintenance of "employment policies and a
23 course of conduct regarding progressive discipline including but
24 not limited to evaluations of performance, verbal warnings, written
25 warnings, transfers, temporary suspension and termination."  Dkt.
26 #1, ¶ 92.  She argues that "[u]pon review of the employee handbook,
27 it is clear that the terms are ambiguous [and] thus factual issues
28 remain as to whether the parties intended the relationship to be at

1   will or only for cause." Dkt. #15, p. 8. Again, Stensland has
2   failed to point to any evidence that these employment policies
3   existed or were put into practice, other than her allegations
4   regarding Stone's and Bowers's verbal "assurances." She has
5   pointed to no "terms" in any "employee handbook" to support her
6   claim. Her allegations in the Complaint, and conclusory assertions
7   in her Declaration, regarding verbal assurances she was given are
8   insufficient to sustain Stensland's burden on summary judgment.
9   *See Giulio v. BV CenterCal, LLC*, ___ F. Supp. 2d ___, 2011 WL
10  3924166, at *10 (D. Or. Sept. 6, 2011) (Hernandez, J.) ("A
11  nonmoving party cannot defeat summary judgment by relying on the
12  allegations in the complaint, or with unsupported conjecture or
13  conclusory statements.") (citing *Hernandez v. Spacelabs Medical,*
14  *Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); Fed. R. Civ. P. 56).
15  Stensland has failed to come forward with admissible evidence to
16  support her claim that an implied contract existed between the
17  parties. "The 'mere existence of a scintilla of evidence in
18  support of [her] position [is] insufficient.'" *Giulio*, 2011 WL
19  3924166, at *10 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
20  242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986); Fed. R.
21  Civ. P. 56(c) (2010)). Even drawing all reasonable inferences in
22  Stensland's favor, the court finds no jury reasonably could render
23  a verdict in her favor on her claim that an implied contract
24  existed, and was breached. Therefore, the defendants' motion for
25  summary judgment as to Stensland's Eighth Claim for Relief: Breach
26  of Implied Contract (Against City of Wilsonville) is **granted.**

27      Stensland further alleges that Stone's and Bowers's "verbal
28  assurances" constituted "an enforceable oral contract" which was

23 - MEMORANDUM OPINION AND ORDER

1   breached when Stensland was terminated without receiving counseling
2   and an opportunity to improve any performance concerns. *Id.*, ¶¶ 97
3   & 98.  "Oregon case law is clear that oral promises may support a
4   claim for breach of contract." *Koepping v. Tri-County Metro.*
5   *Transp. Dist.*, 120 F.3d 998, 1003 (9th Cir. 1997); *cf. Hutton v.*
6   *Jackson County*, slip op., 2010 WL 4906205, at *13 (D. Or. Nov. 23,
7   2010) (Clarke, M.J.).  However, "'[a] casual remark made at a
8   meeting, a phrase plucked out of context, is too fragile a base on
9   which to rest such a heavy obligation inherent in [a contract of
10  employment.]'"  *Koepping*, 120 F.3d at 1003 (quoting *Mursch v. Van*
11  *Dorn Co.*, 851 F.2d 990, 997 (7th Cir. 1988)).

12       The determination as to whether or not an enforceable contract
13  exists is a question of law, "using a standard of objective intent,
14  measured by whether a reasonable person would construe a promise
15  from the words and acts of the other." *Hutton*, 2010 WL 4906205, at
16  *12 (citations omitted); *see Pereira v. Thompson*, 230 Or. App. 640,
17  217 P.3d 236 (2009) ("Whether a contract exists is a question of
18  law.").  When oral promises are directly contradicted by language
19  in generally-distributed, written materials stating that employment
20  is at-will and can be terminated by either party, an employee's
21  reliance on oral promises is considered unreasonable. *Koepping*,
22  120 F.3d at 1003.[1]  This is just such a case.  Any oral statements
23  by Stone and Bowers regarding the City's termination policies were
24
25

26       [1]In any event, Stensland has not alleged or shown that she
27  acted in reliance on Stone's and Bowers's verbal statements.  She
    also has failed to allege or show that either Stone or Bowers had
28  the authority to enter into contractual modifications relating to
    Stensland's employment status on the City's behalf.

24 - MEMORANDUM OPINION AND ORDER

1  directly contradicted by language in Directive #41, expressly
2  specifying that all management employees were employed at will.

3      The court finds as a matter of law that even if Stone and
4  Bowers made the statements alleged by Stensland, those statements
5  nevertheless did not change Stensland's at-will employment and did
6  not create an oral employment contract. The defendants' motion for
7  summary judgment on Stensland's Ninth Claim for Relief: Breach of
8  Oral Contract (Against City of Wilsonville), is, therefore,
9  **granted**.

10     Stensland's Tenth Claim for Relief, alleging the City breached
11 its duty of good faith and fair dealing, arises from the alleged
12 existence of an employment contract.  In addressing Stensland's
13 Seventh, Eighth, and Ninth Claims for Relief, above, the court has
14 found that no employment contract existed, and Stensland was at all
15 relevant times an at-will employee of the City.  Accordingly, no
16 claim can be maintained for breach of any duty related to a
17 nonexistent employment contract, and the defendants' motion for
18 summary judgment on this claim also is **granted**.

19

20 *C.  Wrongful Discharge*

21     The defendants seek dismissal of Stensland's wrongful
22 discharge claim, arguing the claim is not permitted under Oregon
23 law.  The court has discussed, above, the law relating to at-will
24 employment in Oregon.  *See § B, supra*.  In *Winn v. Case Corp.*, 33
25 F.3d 61 (Table), 1994 WL 444616 (9th Cir. 1994), the Ninth Circuit
26 observed that Oregon recognizes two exceptions to the general at-
27 will-employment rule; i.e., "discharge for exercising a job-related
28 right and discharge for complying with a public duty." *Id.*, 1994

25 - MEMORANDUM OPINION AND ORDER

WL 44616, at *2 (citing *Patton*, 719 P.2d at 856-57); *see Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 (2002) (same). This court has observed that resisting sexual harassment is an example of the exercise of a job-related right. *Draper v. Astoria Sch. Dist.*, 995 F. Supp. 1122, 1127 (D. Or. 1998), *abrogated in part on other grounds by Rabkin v. Oregon Health Sciences Univ.*, 350 F.3d 967 (9th Cir. 2003) (citation omitted).

Stensland clearly had a right to be free from gender-based discrimination and sexual harassment in the workplace, whether from above or below her in the chain of command; to report to her superiors when actions constituting harassment or discrimination occurred; and to expect that her complaints would be addressed properly. These rights arise under federal and state law, as well as under the City's own anti-harassment and anti-discrimination directives. If, as Stensland alleges, her termination resulted from her complaints about a hostile work environment due to sexual harassment and gender-based discrimination, then her termination would be contrary to public policy, and her wrongful discharge claim would constitute the type of "narrow exception to the at-will employment doctrine" contemplated by the Oregon courts in establishing the tort of wrongful discharge. *See Draper*, 995 F. Supp. at 1127 ("In Oregon, the tort of wrongful discharge was established to serve as a narrow exception to the at-will employment doctrine in certain limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such conduct.") (citations omitted).

26 - MEMORANDUM OPINION AND ORDER

1    However, the tort of wrongful discharge was intended to
2    provide a remedy for unacceptable conduct only when no other
3    adequate remedy is available. *See Cantley v. DSMF, Inc.*, 422
4    F. Supp. 2d 1214, 1220 (D. Or. 2006) (King, J.) (tort of wrongful
5    discharge "never was intended to be a tort of general application
6    but rather [is] an interstitial tort to provide a remedy when the
7    conduct in question was unacceptable and no other remedy was
8    available'") (quoting *Draper*, 995 F. Supp. at 1128; additional
9    citation omitted). If an existing remedy is adequate to protect
10   the interests of society, then the tort remedy of wrongful
11   discharge is precluded. *See Draper*, 995 F. Supp. at 1130-31; *Ryan*
12   *v. HSC Real Estate*, slip op., No. CV08-1465-KI, 2010 WL 3222443, at
13   *3 (D. Or. Aug. 11, 2010) (King, J). A claim under 42 U.S.C.
14   § 1983 may provide such an adequate federal remedy, precluding a
15   state-law claim for wrongful discharge when the state-law claim and
16   the § 1983 claim are "based upon the same allegations." *See*
17   *Draper*, 995 F. Supp. at 1131. Oregon law prohibiting unlawful
18   employment discrimination also may provide an adequate remedy to
19   protect the interests of society in maintaining non-discriminatory
20   workplaces. *See* ORS § 659A.030 (prohibiting employment
21   discrimination on the basis of race, color, religion, sex, sexual
22   orientation, national origin, marital status, or age).

23   In the present case, Stensland alleges she was wrongfully
24   discharged in retaliation for her attempts to enforce her rights
25   under ORS § 659A.030 and 42 U.S.C. § 1983. Both of these statutes
26   allow a successful plaintiff to recover, where applicable,
27   equitable relief, compensatory damages, and punitive damages. *See*
28   ORS § 659A.881(1) & (3)(a); 42 U.S.C. § 1983. Moreover, § 1983

27 - MEMORANDUM OPINION AND ORDER

constitutes the *exclusive* federal remedy for Stensland's equal
protection claims. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S.
701, 733, 109 S. Ct. 2702, 2722, 105 L. Ed. 2d 598 (1989) ("the
express cause of action for damages created by § 1983 constitutes
the exclusive federal remedy for violation of the rights guaranteed
in § 1981 by state governmental units"); *Pittman v. Oregon,
Employment Dept.*, 509 F.3d 1065, 1068 (9th Cir. 2007) (citing
*Jett*).

        As the *Draper* court noted, a § 1983 claim will not always
provide an adequate remedy to preclude a wrongful discharge claim.
For example, a § 1983 claim "is subject to unique defenses, such as
qualified immunity." *Draper*, 995 F. Supp. at 1131. However, on
the facts of this case, the court finds the state and federal
statutes do provide an adequate remedy, precluding Stensland's
common-law wrongful discharge claim. Her statutory and common-law
claims are "based upon the same allegations." She will have to
prove substantially similar elements to prevail on either the
statutory claim or the common-law wrongful discharge claim. She
will have to show that she engaged in a protected activity, and she
was terminated in retaliation for engaging in the protected
activity. Remedies available under the statutes and the common-law
claim also are the same. "For actions alleging violations of ORS
§ 659A.030, the court may award equitable relief, compensatory
damages, and punitive damages. ORS § 659A.885(1) & 3(a). These
are the same remedies available for the tort of wrongful
discharge." *Ryan*, 2010 WL 3222443, at *3. The standard of proof
(preponderance of the evidence) also is the same under both the
statutory and the common-law claim.

28 - MEMORANDUM OPINION AND ORDER

Thus, because ORS § 659A.030 and 42 U.S.C. § 1983 provide an adequate remedy at law for Stensland's wrongful discharge claim, she cannot maintain a common-law claim for wrongful discharge under Oregon law. Therefore, the defendants' motion to dismiss Stensland's Sixth Claim for Relief (Wrongful Discharge, against the City) is **granted.**

### D.   *Section 1983 Claims*

The defendant City of Wilsonville moves for summary judgment on Stensland's First and Second Claims for Relief against the City, in which she asserts violations of 42 U.S.C. § 1983. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983 (1996).

"[M]unicipalities and other local governmental bodies are 'persons' within the meaning of § 1983 . . . [but] a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Board of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 1387-88, 137 L. Ed. 2d 626 (1997). Stensland may establish the City's liability under § 1983 in one of the following three ways:

> First, [she] may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a

29 - MEMORANDUM OPINION AND ORDER

1                          longstanding practice or custom which consti-

                         tutes the standard operating procedure of the

2                          [City]. . . .    Second, [she] may establish

                         that the individual who committed the

3                          constitutional tort was an official with final

                         policy-making authority and that the

4                          challenged action itself thus constituted an

                         act of official governmental policy. . . .

5                          Whether a particular official has final

                         policy-making authority is a question of state

6                          law. . . .    Third, [she] may prove that an

                         official with final policy-making authority

7                          ratified a subordinate's unconstitutional

                         decision or action and the basis for it.

8

9 *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)

10 (internal quotation marks, citations omitted).

11      Stensland argues she has alleged facts sufficient for a jury

12 to render a verdict in her favor under all three of the *Gillette*

13 criteria.  *See* Dkt. #15, pp. 9-12.  She alleges the City endorsed

14 and approved the actions of Fisher, Stone, and Bowers, and ratified

15 their unconstitutional actions by failing to investigate her claims

16 of harassment, discrimination, and hostile work environment.  She

17 claims this constituted a policy, custom, or longstanding practice

18 because her complaints regarding the unconstitutional activities

19 were ongoing over a long period of time, with ongoing acceptance

20 and ratification by officials with final policy-making authority,

21 including the City Manager, Arlene Loble.

22      The defendants have the initial burden to prove the absence of

23 a genuine issue of material fact.  *In re Oracle Corp.*, 627 F.3d at

24 387 (citation omitted).  Although the defendants need not "support

25 [their] motion with affidavits or other similar materials *negating*

26 the opponent's claim," the court should not grant summary judgment

27 unless the record before the court "demonstrates that the standard

28 for the entry of summary judgment . . . is satisfied."  *Celotex*

30 - MEMORANDUM OPINION AND ORDER

1  *Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91
2  L. Ed. 2d 265 (1986).   Here, the defendants have failed to prove
3  the absence of a genuine issue of material fact regarding
4  Stensland's § 1983 claim against the City.   Although they state, in
5  their brief, that City policy-making rests with the City Manager,
6  with approval of the City Council, *see* Dkt. #11, p. 10, they have
7  offered no evidence to support that statement, nor have they shown
8  that the final policy-making authority was not delegated.
9  Stensland alleges she was told by Bowers that the City Manager had
10 delegated to him the decision-making responsibility regarding
11 Stensland's termination.  *See* Dkt. #20, ¶ 19.  "The substantive law
12 governing a claim or defense determines whether a fact is
13 material. . . .  If the resolution of a factual dispute would not
14 affect the outcome of the claim, the court may grant summary
15 judgment."  *Day v. United Parcel Serv., Inc.*, slip op., No. 09-CV-
16 1261-SU, 2011 WL 5239732, at *2 (D. Or. Nov. 1, 2011) (Brown, J.)
17 (citing *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th
18 Cir. 2006)).   Here, resolution of the factual issue regarding who
19 actually had policy-making authority for the City with regard to
20 investigations of harassment and discrimination, and in this
21 particular instance, with regard to Stensland's termination and the
22 basis for it, could affect the outcome of Stensland's § 1983 claim
23 against the city.

24     This analysis is illustrated by the U.S. Supreme Court's
25 decision in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-41,
26 106 S. Ct. 1292, 1298-99, 89 L. Ed. 2d 452 (1986), summarized by
27 the court in *Williams v. Multnomah Education Service District*, No.
28

1   CV-97-1197-ST, 1999 WL 454633 (D. Or. Apr. 14, 1999) (Stewart,

2   M.J.; opinion adopted *in toto* by Frye, J.), as follows:

3               In *Pembaur*, . . . the Supreme Court held
                that a single decision by a municipal policy-
4               maker may be sufficient to trigger munici-
                pality liability under § 1983 as long as there
5               was a " deliberate choice to follow a course
                of action [] made from among various alterna-
6               tives by the official or officials responsible
                for establishing final policy with respect to
7               the subject matter in question." However, the
                municipal policymaker must have final authori-
8               ty to establish municipal policy. Authority
                to make municipal policy may be granted by
9               state legislative enactment or may be dele-
                gated by an official with final policymaking
10              authority. The Court provided an example
                clarifying its ruling. In the example, a
11              Board of County Commissioners sets the county
                employment policy but allows the County
12              Sheriff discretion to hire and fire employees.
                If the Sheriff exercises his discretion in an
13              unconstitutional manner, the county would not
                be liable because the Board still controls
14              county policy. But if the Board had delegated
                its power to establish final employment policy
15              to the Sheriff, then the Sheriff's decisions
                would represent county policy and the county
16              would be liable.

17  *Williams*, 1999 WL 4546333, at *11. In the present case, the record

18  is insufficient to prove who had final authority to establish the

19  City's policy regarding the investigation of claims of harassment

20  and discrimination, the termination of employees within particular

21  departments, or whether the authority to terminate Stensland was

22  delegated to Bowers in this particular case.

23          Stensland also argues significant discovery remains to be

24  completed in this case, including depositions and outstanding

25  responses to discovery, and she asserts this additional discovery

26  concerns significant factual issues that likely will support her

27  claims. She represented in her brief that "it appears a Motion to

28  Compel will be required to address Defendants' objections to [her]

32 - MEMORANDUM OPINION AND ORDER

Requests for Production." Dkt. #15, pp. 2-3. Nevertheless, she waited almost three months after filing her brief, and two weeks after oral argument, to file a motion to compel. She never has filed a motion under Federal Rule of Civil Procedure 56(d) to request additional time to complete discovery necessary for her to respond to the defendants' motion for summary judgment.

Nevertheless, the court finds the current record is insufficient to support summary judgment. On the current record, and drawing all justifiable inferences in Stensland's favor, she has offered evidence from which a jury could render a verdict in her favor on her § 1983 claim against the City. Accordingly, the City's motion for summary judgment on Stensland's First and Second Claims for relief is **denied.[2]**

### E.   *Negligent Training and Supervision*

The City moves for summary judgment on Stensland's Third Claim for Relief, in which she claims her constitutional rights were violated due to the City's deliberate indifference and failure to "supervise, train and discipline Fisher, Stone, and Bowers regarding the City's Anti-Harassment Policy and reporting procedures." Dkt. #1, ¶ 52. The City also moves for dismissal of this claim, arguing the claim is not adequately pled under § 1983, and in any event, the City has no duty to train its employees with regard to the City's sexual harassment policies. Dkt. #11, p. 17.

Stensland has not responded to the City's motion for summary judgment on this issue. She has responded to the motion to

---

[2]*But see* the court's ruling in section A, *supra*, regarding those claims that arose prior to February 16, 2010.

33 - MEMORANDUM OPINION AND ORDER

1   dismiss, arguing her Third Claim for Relief is adequately pled
2   under § 1983, and case law supports denial of the City's motion to
3   dismiss.

4        In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct.
5   1197, 103 L. Ed. 2d 412 (1989), the U.S. Supreme Court held that
6   under certain circumstances, a municipality can be liable under
7   § 1983 "for constitutional violations resulting from its failure to
8   train municipal employees." *Id.*, 489 U.S. at 380, 387, 109 S. Ct.
9   at 1200, 1204. However, the failure to train must, itself, result
10  in the constitutional deprivation suffered by the plaintiff, and
11  moreover, the municipality's failure to train must "reflect[]
12  deliberate indifference to the constitutional rights of its
13  inhabitants." *Id.*, 489 U.S. at 392, 109 S. Ct. at 1207. "Only
14  where a municipality's failure to train its employees in a relevant
15  respect evidences a 'deliberate indifference' to the rights of its
16  inhabitants can such a shortcoming be properly thought of as a city
17  'policy or custom' that is actionable under § 1983." *Id.*, 489 U.S.
18  at 389, 109 S. Ct. at 105. This is a high standard, and requires
19  more than, for example, "an otherwise sound program [that] has
20  occasionally been negligently administered." *Id.*, 489 U.S. at 391,
21  109 S. Ct. at 1206.[3]

22       The evidence offered by Stensland in support of this claim
23  falls far short of that required to sustain a failure-to-train
24  claim under *Harris*. Stensland has offered no evidence that the
25

26       [3]The passage quoted by Stensland in support of her assertion
    that "[t]here is a clearly adequate basis for the claim," Dkt. #15,
27  p. 13, is not from the plurality opinion, but rather is from the
    concurring opinion by Justice O'Connor, joined by Justices Scalia
28  and Kennedy. *See Harris*, 489 U.S. at 397, 109 S. Ct. at 1209.

34 - MEMORANDUM OPINION AND ORDER

City's failure to train or supervise its employees in the administration of its anti-harassment and anti-discrimination policies resulted in the harassment and discrimination of which she complains, or reflected deliberate indifference to the constitutional rights of the City's inhabitants. The facts as pled do not plausibly suggest a claim entitling Stensland to relief, nor do they show any genuine issue of material facts exists for trial. The court, therefore, **grants** the City's motion for summary judgment as to Stensland's Third Claim for Relief: Constitutional Rights Violations by City of Wilsonville Due to Failure to Adequately Train and Supervise. Accordingly, the defendants' motion to dismiss this claim is **found to be moot.[4]**

---

[4]The court makes two additional observations regarding the defendants' motions on Stensland's Third Claim for Relief. First, in support of their motion to dismiss this claim, the defendants rely heavily on a quote from *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), for the proposition that an anti-harassment policy is not necessary "as a matter of law." *See* Dkt. #11, p. 17. The *Faragher* Court observed, "While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293. The defendants have taken the quote out of context. The Court did not hold that, *as a matter of law*, an anti-harassment policy with complaint procedure is *never* necessary; rather, the Court was expanding on the proof required to sustain the two-part affirmative defense to liability or damages described by the Court in the case. The Court made the point that it will not always be necessary to prove "an employer had promulgated an antiharassment policy with complaint procedure" in order to prevail on the defense. *See id.*

Second, in support of their motion for summary judgment on this claim, the defendants argue "the claim is prohibited by the exclusive remedy provision contained in Oregon's Workers Compensation Law (ORS 656.018)[.]" Dkt. #11, p. 11; *see id.*, pp. 11-14. The argument presumably was based on a misunderstanding of the nature of this inartfully-pled claim; Stensland did not indicate clearly, in her Complaint, that this claim arises under

### F.   Individual Defendants

Bowers and Stone move to dismiss Stensland's First Claim for Relief against them - the only claim she has brought against these individual defendants.  *See* Dkt. #1.  Bowers and Stone argue Stensland has alleged they acted only in their official capacities during the events giving rise to this action, and therefore, the City is the only proper defendant.  Stensland responds that she has properly alleged Bowers and Stone acted in their individual capacities, under color of state law.  She further suggests that should the court find her complaint deficient in this regard, the deficiency may be cured by amendment.

Stensland has the burden to plead properly and to prove each essential element of her § 1983 claim.  *See Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997).  "To state a claim for relief under section 1983, [Stensland] must plead two essential elements: 1) that the Defendants acted under color of state law; and 2) that the Defendants caused [her] to be deprived of a right secured by the Constitution and laws of the United States."  *Id.* (citing *Howerton v. Gabica*, 708 F.2d 380, 382 (9th Cir. 1983)).  Stensland has met both prongs of this pleading requirement in her Complaint.

The cases demonstrate that historically, there has been considerable confusion among litigants when determining whether an action is brought against individuals in their official capacity or their individual capacity.  The defendants correctly observe that when an action is brought against a person acting in an official

§ 1983.  In any event, because the court grants the defendants' motion for summary judgment as to Stensland's Third Claim for Relief on other grounds, the court does not address this argument.

36 - MEMORANDUM OPINION AND ORDER

capacity at the time of the alleged actions, then suit against the governmental officer in the officer's official capacity "is equivalent to a suit against the governmental entity itself." *Gomez v. Vernon*, 255 F.3d 1118, 1126 (9th Cir. 2001) (citing *McRorie v. Shimoda*, 795 F.2d 780, 783 (9th Cir. 1986)).

The U.S. Supreme Court has examined the distinction between individual-capacity (or personal-capacity) lawsuits and official-capacity lawsuits, explaining that "[p]ersonal-capacity suits seek to impose personal liability upon a governmental official for actions he takes under color of state law. . . . Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (quoting *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 660 n. 55, 98 S. Ct. 2018, 2035 n.55, 56 L. Ed. 2d 611 (1978)). "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.*, 473 U.S. at 166, 105 S. Ct. at 3105 (emphasis by the Court; citing *Monroe v. Paper*, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961)).

Here, construing the Complaint in Stensland's favor and taking her factual allegations as true, *see Gambee*, *supra*, the court finds Stensland has pled facts sufficient to allow the court to draw the reasonable inference that the individual defendants are liable for the misconduct alleged. Stensland has pled facts indicating Stone and Bowers were aware of ongoing harassment, gender-based discrimination, and a hostile work environment created by Fisher's

37 - MEMORANDUM OPINION AND ORDER

actions, but they failed to investigate Stensland's claims properly, and took no action to remedy the situation.  She also has alleged that her work load was reduced and she ultimately was terminated in retaliation for her complaints.  If proved at trial, these facts could give rise to liability under § 1983.

The individual defendants' motion to dismiss is, therefore, **denied.**[5]

### CONCLUSION

In summary, the court orders as follows:[6]

1.  Stensland has until **January 16, 2012,** to either amend her Complaint to add the bankruptcy trustee as plaintiff with regard to the pre-February 16, 2010, claims, or to have the bankruptcy trustee ratify those claims by formally abandoning them as assets of the bankruptcy estate.  The court **reserves** ruling on Stensland's claims arising prior to February 16, 2010, until after **January 16, 2012.**

2.  The defendants' motion for summary judgment is **granted** as to Stensland's Seventh, Eighth, Ninth, and Tenth Claims for Relief.

3.  The City's motion to dismiss Stensland's Third and Sixth Claims for Relief is **granted.**

---

[5]But, again, see the court's ruling in section A, *supra*, regarding those claims that arose prior to February 16, 2010.

[6]This order addresses Stensland's First, Second, Third, Sixth, Seventh, Eighth, Ninth, and Tenth Claims for Relief.  The defendants have not moved for summary judgment or dismissal as to Stensland's Fourth and Fifth Claims for Relief.

38 - MEMORANDUM OPINION AND ORDER

3.    Subject to any later ruling regarding Stensland's pre-February 16, 2010, claims, the City's motion for summary judgment as to Stensland's First and Second Claims for Relief is **denied.**

4.    Subject to any later ruling regarding Stensland's pre-February 16, 2010, claims, the individual defendants' motion to dismiss Stensland's First Claim for Relief against them is **denied.**

IT IS SO ORDERED.

Dated this 14th day of December, 2011.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
Unites States Magistrate Judge

39 - MEMORANDUM OPINION AND ORDER